**MARTIN OIL MARKETING LTD**
**and Speedway SuperAmerica**
**LLC, Appellants,**

v.

**John L. KATZIORIS, Appellee.**

No. 45A05–0808–CV–479.

Court of Appeals of Indiana.

July 1, 2009.

Rehearing Denied Sept. 3, 2009.

Michael V. Knight, Barnes & Thornburg LLP, South Bend, IN, Attorney for Appellants.

James B. Meyer, Meyer & Wyatt, P.C., Gary, IN, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge.

Upon interlocutory appeal, Martin Oil Marketing Ltd. (Martin Oil) and Speedway SuperAmerica LLC (SSA) (collectively, the Appellants) appeal the trial court's denial of their motion for summary judgment as to claims asserted by John L. Katzioris concerning the alleged contamination of Katzioris's property by Martin Oil. Martin Oil presents several issues, but we find the following to be dispositive of the appeal: Did the trial court err in denying the Appellants' motion for summary judgment?

We reverse.

The facts favorable to Katzioris, the nonmoving party, are that beginning in the early 1970s, Katzioris operated a family restaurant, Johnny's Gyros, at the corner of U.S. 12 and Lake Street in Gary, Indiana. After a time, Katzioris's son, Louis, helped Katzioris operate the restaurant. In 1990, Katzioris became ill and his wife assumed the lead role in operating the restaurant. Also at that time, Katzioris signed a power of attorney authorizing Louis to act on Katzioris's behalf in all matters. From that time on, Katzioris never worked at the restaurant again. Although Katzioris's wife and Louis operated the restaurant for a year or two after Katzioris quit working, the restaurant closed in 1991 or 1992 and the building was torn down in 1993 or 1994.

Martin Oil owned the property abutting Katzioris's property on the south and operated a retail establishment there, which included the sale of gasoline stored in underground tanks. In 1994, Martin Oil sold its property to SSA. At that time, it was discovered that an environmental release from the Martin Oil property had contaminated the soil. In 1994, Martin Oil hired The Environmental Solutions Group (ESG)

to determine the extent of and to remediate the contamination. ESG decided it should conduct tests to determine whether the contamination extended onto Katzioris's property. ESG claims it obtained Katzioris's permission before conducting the testing. We will discuss this matter more thoroughly below. On December 2, 1994, ESG sent a report to Martin Oil detailing ESG's findings. The report stated, in pertinent part,

> Initial groundwater level measurements indicated that a northerly flow direction existed at the site. Based on this information the alley to the north and a vacant property site (formerly Johnny's Famous Gyros) owned by John L. Katzioris was targeted for the offsite investigation. Permission (verbal) was first obtained from the City of Gary and Mr. Katzioris. A utility line check was also conducted by various utility companies.

*Appellants' Appendix* at 153. In order to run their tests and obtain samples, ESG drilled holes (referred to throughout the appellate materials as either "wells", *id.* at 309, or "borings", *id.* at 271). At least by 1994, and according to Katzioris, his wife observed borings and wells on their property, which were visible to her as capped pipes protruding from the ground. In a typical soil boring, ESG would test the soil removed therefrom in order to detect if it was contaminated. If groundwater was encountered, then ESG would install "monitoring wells." *Id.* at 251. Several borings and monitoring wells were installed on Katzioris's property to determine the extent of the contamination.

Sometime probably in 2000, Louis negotiated a sale of the property to Paula Peoples. When the deal was nearly consummated, "about two or three months within October of 2000", *id.* at 117, "someone from IDEM" called and informed Louis that the restaurant property was contaminated. *Id.* at 116. At that point, Peoples backed out of the sale. It appears, however, that there is still a prospective buyer for the property, as reflected in the following excerpt from Louis's deposition:

Q. Have you had any knew [sic] offers on his property since [the Peoples offer]?

A. My father had one back in '05 from this—I still don't know who those people are. But this real estate person.

Q. From H.K. Realty, Inc.? And we're talking about—

A. Yeah.

\* \* \* \* \* \*

Q. You don't know why the deal hasn't closed even yet?

A. Well, as much as I know, they keep finding offers to renew.

Q. Right.

A. Until the land is cleaned up.

Q. So that's—as far as you know this is a bona fide deal that can close as soon as the land is cleaned up?

A. That's correct.

*Id.* at 120.

In July 2002, Katzioris signed a license granting SSA permission to enter onto his property to assess soil, surface, and ground water contamination. The term of the license was agreed to "continue in effect until SSA completes the requisite assessment and remediation." *Id.* at 3. During the ensuing couple of years, Katzioris made "repeated demands" upon the Appellants for "losses and damages" Katzioris suffered as a result of the "the contamination of his property with hazardous pollutants and the resultant loss of use of his property because of the contamination and the subsequent remediation activities." *Id.* at 67.

On August 9, 2006, Katzioris filed a complaint for damages and injunctive relief against Martin Oil and SSA. Under the theory of continuing trespass, Katzioris sought damages for the discharge of hazardous pollutants on Katzioris's property, as measured by the diminution of the value of the property caused by the contamination. The complaint also alleged Martin Oil and SSA engaged in intentional, willful, malicious, and obdurate conduct, thereby exposing them to liability for punitive damages and attorney fees.

On January 30, 2008, the Appellants filed a motion for summary judgment claiming that Katzioris's lawsuit was barred by the six-year statute of limitations set out in Ind.Code Ann. § 34–11–2–7 (West, PREMISE through 2008 2nd Regular Sess.). The trial court denied the motion on May 30, 2008, following a hearing. On the critical question of Katzioris's knowledge of the facts giving rise to this lawsuit, the trial court stated:

> This Court finds that the designated evidence leads to conflicting inferences on the issue of whether Katzioris gave the Defendants' [sic] permission to enter his property in 1994. Katzioris is a Greek immigrant who never went beyond grade school; indeed, an interpreter was required for his deposition. In 1993 and 1994, Katzioris was sick with heart, prostate and gall bladder problems. He indicated he gave his son, Louis, a Power of Attorney during that period of time to handle his business dealings. Though the Defendants allege that Katzioris gave permission, when asked whether he disputed that he gave permission to enter his property in 1994, Katzioris testified, "No, I wasn't here. If somebody gave it, I don't know it." After a colloquy between counsel, Katzioris was asked the following question by counsel for the Defendants, "I'd like to know if he remembers giving permis-
sion or if he remembers not giving permission or he just doesn't remember." Katzioris answered, "I don't remember at all."

*Appellants' Appendix* at 275. On June 27, the Appellants submitted a motion asking the trial court to certify its order for interlocutory appeal. The trial court granted the motion to certify on July 18, 2008. This court accepted the interlocutory appeal on September 22, 2008.

Our standard of review for an order granting or denying a motion for summary judgment is well settled. Summary judgment is appropriate if the "designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). The moving party bears the burden of making a prima facie showing there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Morgan County Hosp. v. Upham*, 884 N.E.2d 275 (Ind.Ct.App.2008), *trans. denied.* If these two requirements are met, the burden shifts to the nonmovant to set forth specifically designated facts showing there is a genuine issue of material fact for trial. *Id.* " 'A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue.' " *Id.* at 279 (quoting *Huntington v. Riggs*, 862 N.E.2d 1263, 1266 (Ind.Ct.App.2007), *trans. denied* ). When considering the trial court's ruling on appeal, we are bound by the same standard as it was, meaning we consider only those matters which were designated at the summary judgment stage. *Morgan County Hosp. v. Upham*, 884 N.E.2d 275. "We do not reweigh the evidence, and we will liberally construe all designated evidentiary material in the

light most favorable to the nonmoving party to determine whether there is a genuine issue of material fact for trial." *Id.* at 279.

The threshold issue in this appeal involves the application of a statute of limitations. In a nutshell, Katzioris sued the Appellants under the theory of continuing trespass for coming onto his property without authorization and contaminating his land. The Appellants sought summary judgment on grounds that Katzioris did not file his claim within the allotted six years, pursuant to I.C. § 34–11–2–7(3). Neither party disputes that this action is governed by I.C. § 34–11–2–7.

■■■ A statute of limitations is an affirmative defense that must be both pleaded and proven by the party asserting it. *Reiswerg v. Statom,* 897 N.E.2d 490 (Ind. Ct.App.2008); *see also* Ind. Trial Rule 8(C). A determination of whether Katzioris's complaint is time-barred by I.C. § 34–11–2–7 requires that we fix the time when the cause of action accrued. *See Cooper Indus., LLC v. City of South Bend,* 899 N.E.2d 1274 (Ind.2009). A cause of action accrues under this statute "when a claimant knows, or in the exercise of ordinary diligence should have known of the injury." *Id.* at 1280. "The determination of when a cause of action accrues is generally a question of law for the courts to determine. For claims to accrue, it is not necessary that the full extent of the damage be known or even ascertainable, but only that some ascertainable damage has occurred." *Id.* (internal citations omitted). Katzioris's complaint was filed on August 9, 2006. Thus, we must determine if Katzioris knew of, or reasonably could have discovered, the damage to his property before August 9, 2000.

Not surprisingly, Katzioris's knowledge of ESG's activities on his property was the focus of the designated evidence and the parties' respective arguments at the summary judgment hearing. It appears that ESG entered onto his property at least by 1994, and perhaps even earlier. Shortly after that, Katzioris's wife noticed the pipes and wells ESG had installed. According to Louis, his mother asked about the pipes at that time. Louis offered two different accounts of the response. He first claimed that when she asked about the pipes, he (Louis) replied, "oh, that's nothing. The water department has that. They shut off with that." *Appellants' Appendix* at 116. Later, Louis explained it this way: "Back in—she told my father, and then I inadvertently heard it when I was at home. I said, what are you guys talking about? He [Katzioris] said, those are something from the water company." *Id.* at 117. Katzioris's recollection of these events is decidedly less clear.

During Katzioris's deposition, the Appellants' counsel repeatedly asked about Katzioris's awareness of ESG's activities on Katzioris's property. Katzioris's memory has faded and he is unable to recall much with respect to those events. He recalled seeing what he characterized as holes, but did not remember when he saw them. He did not recall when the restaurant was torn down. When did his wife first discover the holes? "I cannot answer at all." *Id.* at 99. Katzioris did not remember when the State advised him that his property was contaminated. He did not remember signing the 2002 license agreement. In fact, there were many other details concerning these events about which Katzioris has no recollection.

Returning now to the pivotal question, we must determine whether a question of fact remains as to whether, before August 9, 2000, Katzioris knew or in exercise of ordinary diligence should have known of contamination of his property. The Appellants presented evidence that he did. A report sent in 1994 from ESG to Martin

Oil indicated that Katzioris had given oral permission to enter onto his property to test for and, if necessary, remediate contamination. Kiest, then president of ESG, submitted an affidavit stating that "ESG sought and received permission to conduct tests, take samples, monitor and conduct remediation efforts on Johnny's Property from the City of Gary *and from John L. Katzioris* in late fall of 1994." *Id.* at 148 (emphasis supplied). If true, this means that in 1994 Katzioris was apprised by ESG that his property might have been contaminated and that such might require clean-up efforts, or remediation. Of course, the "if true" qualification is the all-important question here.

■ Did Katzioris present evidence sufficient to call that assertion into question? The Appellants' counsel questioned Katzioris closely on precisely that issue. Katzioris was asked, "Can you dispute that you ever ... gave permission to enter on Johnnie's [sic] Gyros property in 1994?" *Id.* at 104. Katzioris answered in the negative. Repeating now the all-important question from the Appellants' counsel, Katzioris was asked (through an interpreter), "I'd like to know if he remembers giving permission or if he remembers not giving permission or he just doesn't remember." *Id.* at 104–05. Katzioris replied, "I don't remember at all." *Id.* at 105. Thus, in response to Kiest's sworn affidavit that Katzioris *did* give permission to enter onto his property and test for contamination and conduct remediation, Katzioris could only respond that he could not remember whether he did or did not do so. Therefore, Katzioris admitted in his sworn deposition testimony that he could not contradict Kiest's claim that Katzioris had given his permission in 1994 to test for contamination on his property. As apparently no one else was a party to that agreement, the primary evidence regarding the giving of permission is settled: Kiest stated that Katzioris gave permission, and Katzioris stated under oath that he could not contradict that assertion.

■ Yet, citing Katzioris's response and noting Katzioris's ill health and limited command of the English language, the trial court concluded that there remained a question of fact as to whether Katzioris did, in fact, give permission in 1994 as Kiest claimed. We reach the opposite conclusion. First, the standard for making this determination does not take into account Katzioris's health and linguistic challenges. "[A] plaintiff has a duty under the discovery rule to exercise reasonable diligence to discover the negligent acts or omissions." *Bambi's Roofing, Inc. v. Moriarty*, 859 N.E.2d 347, 356 (Ind.Ct.App. 2006). " '[T]he cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another.' " *Filip v. Block*, 879 N.E.2d 1076, 1082 (Ind.2008) (quoting *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind.1992)). The foregoing authority reflects that we apply an objective standard to the plaintiff's actions, not a subjective one. That is, we determine what a reasonable person would have done under the circumstances. Second, the fact remains that Kiest's sworn testimony that Katzioris consented to ESG's diagnostic and possible remediation activities on his property stands uncontroverted in the record. Even if this did not constitute direct evidence of Katzioris's knowledge of possible contamination, and putting aside for the moment Katzioris's uncontroverted awareness of the sudden appearance in the early 1990s of capped pipes on his property, ESG's request for permission surely constituted "sufficient information to cause

him to inquire further in order to determine whether a legal wrong ha[d] occurred." *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683 (Ind.Ct.App.2006).

■ In summary, Martin Oil and SSA presented evidence that Katzioris gave ESG permission in the fall of 1994 to enter his property to test for contamination and to conduct remediation efforts if necessary, evidence that Katzioris by his own admission is unable to contradict. Thus, as of that time, Katzioris possessed sufficient information to cause a reasonable person to inquire further in order to determine whether he had suffered a legal wrong. *See id.* This occurred long before August 9, 2000, the date before which said information and knowledge defeats Katzioris's claim by application of the six-year statute of limitations. The trial court erred in denying the Appellants' motion for summary judgment on that basis.

Judgment reversed.

VAIDIK, J., concurs.

NAJAM, J., dissents with opinion.

NAJAM, Judge, dissenting.

I respectfully dissent. The majority concludes that Katzioris' equivocal testimony amounts to a concession that he knew or should have known of the Appellants' conduct as early as 1994, thereby causing the statute of limitations to have run well before he filed this action in 2006. I would hold that the evidence favorable to Katzioris, the nonmoving party in this summary judgment appeal, is sufficient to create a genuine question of material fact regarding what he actually knew or should have known and when that knowledge should be attributed to him. As such, I would affirm the trial court's denial of the Appellants' summary judgment motion.

Our standard of review in appeals from the grant or denial of a motion for summary judgment is well established:

A party is entitled to summary judgment if no material facts are in dispute.... Ind. Trial Rule 56(C) ("The judgment sought shall be rendered forthwith if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"). When reviewing the propriety of a ruling on a motion for summary judgment, this Court applies the same standard as the trial court. Review is limited to those materials designated to the trial court. The Court accepts as true those facts alleged by the nonmoving party, construes the evidence in favor of the nonmoving party, and resolves all doubts against the moving party.

*Estate of Mintz v. Conn. Gen. Life Ins. Co.*, 905 N.E.2d 994, 998 (Ind.2009) (some citations omitted). And, in cases such as this one, "[a] party seeking appellate reversal of the denial of summary judgment must demonstrate that the designated evidentiary matter negates the existence of any genuine issue of material fact...." *Chi Yun Ho v. Frye*, 880 N.E.2d 1192, 1197 (Ind.2008).

Here, the facts favorable to Katzioris demonstrate the following. In 1994, Martin Oil hired ESG to determine the extent of Martin Oil's environmental damage. Later that year, Katzioris, his wife, and his son, Louis, observed capped pipes protruding from their property, which was adjacent to Martin Oil's property. Louis believed that the pipes were installed by the water department and "never even thought" that they could be something else. Appellants' App. at 116. Because of that mistaken belief, he did not investigate further. And Louis heard Katzioris reach

the same conclusion about the capped pipes: "He [Katzioris] said[ ] those are something from the water department." *Id.* at 117. Around October of 2000, IDEM informed Louis that Katzioris' property had been contaminated by Martin Oil. *See id.*

In reversing the trial court's denial of the Appellants' motion for summary judgment, the majority emphasizes three facts. First, the majority notes that ESG claims to have received oral permission from Katzioris in 1994 to enter his property to test for and possibly remediate contamination. Second, the majority notes that Katzioris, whose "memory has faded and ... is unable to recall much," slip op. at 8, did not expressly refute ESG's claim. And third, the majority recognizes that Katzioris was aware of the capped pipes on his property in the early 1990s. In light of those facts, the majority holds that, in 1994, "Katzioris possessed sufficient information to cause a reasonable person to inquire further in order to determine whether he had suffered a legal wrong." *Id.* at 11.

The majority's emphasis of those three facts ignores our standard of review in an appeal from the denial of a summary judgment motion. As for the majority's first and second emphasized facts, Indiana law does not require a nonmovant in a summary judgment proceeding to provide a line-by-line refutation of the moving party's evidence. Katzioris presented evidence—namely, Louis' testimony—that demonstrated that, before October of 2000, Katzioris and his family believed the capped pipes were installed by the water department. The inference from that evidence is that he and his family were unaware that an entity other than the water department—ESG—had installed the

pipes. Insofar as the Appellants have presented conflicting evidence, a genuine question of material fact exists as to which evidence the factfinder should give credit.[1]

The majority's third emphasized fact likewise does not overcome the moving party's burden on summary judgment. Without question, the evidence demonstrates that Katzioris and his family were aware of the capped pipes on their property as early as 1994. The question, then, is whether the mere presence of those capped pipes put Katzioris on inquiry notice that he might have a legal cause of action against another party. But "[w]hether knowledge of an adverse interest will be imputed in any given case is a question of fact to be determined objectively from the totality of the circumstances." *Keybank N.A. v. NBD Bank,* 699 N.E.2d 322, 327 (Ind.Ct.App.1998). Here, again, Katzioris presented evidence that he and his family believed that the capped pipes were placed on the property by the water department, not by ESG. If the factfinder credits Katzioris' evidence and discredits the Appellants', then the factfinder might also conclude that the totality of the circumstances from the credited evidence does not require imputing notice of ESG's activity to Katzioris. Similarly, the factfinder might reach the opposite conclusion and determine that notice should be imputed to Katzioris based on the Appellants' evidence. In any event, those conclusions are for the factfinder, and not for a court at the summary judgment phase of this proceeding.

In sum, the majority's reversal of the trial court's ruling improperly reaches factual conclusions relying exclusively on the testimony of an elderly man of failing

---

**1.** I note that, depending on the facts found by the factfinder, the statute of limitations might well apply to Katzioris' cause of action. But the summary judgment stage is simply too early to make that call.

health and memory. At the same time, the majority disregards the testimony of other competent witnesses. I would hold that the trial court did not err in denying the Appellants' motion for summary judgment and that the Appellants are unable on appeal to negate the existence of genuine questions of material fact regarding what Katzioris knew and when he knew it. *See Chi Yun Ho,* 880 N.E.2d at 1197. The evidence tendered to the trial court by Katzioris, that he and his family believed the capped pipes were placed on the property by the water department, was sufficient to survive summary judgment. Thus, I would affirm the trial court's denial of the Appellants' motion for summary judgment. I express no opinion on any issue raised by the parties but not addressed in the majority opinion.

